UNITED STATES v. MOTION PICTURE FILM "THE SPIRIT OF '76."

(District Court, S. D. California, S. D.   November 30, 1917.)

WAR ⬤⟶4—INTERFERENCE WITH PROSECUTION OF WAR—MOTION PICTURE CALCULATED TO WORK DISSENSION AMONG ALLIES.

Where a motion picture film relating to Revolutionary subjects portrayed false and exaggerated scenes of British cruelty in such a manner as was calculated to cause dissension between the United States and Great Britain, who are allies in the present war, *held*, that a motion for the return of the film, which had been seized by the United States, should be denied, and the original seized; it appearing that, when the film was exhibited before governmental representatives, the objectionable scenes were deleted and then reinserted.

At Law. Proceeding by the United States against the Motion Picture Film "The Spirit of '76." On motion for return of film. Motion denied, without prejudice.

Robert O'Connor, U. S. Atty., of Los Angeles, Cal.

I. R. Rubin, of Los Angeles, Cal., for Robert Goldstein.

Joseph Scott, of Los Angeles, Cal., for certain stockholders of Continental Producing Co.

BLEDSOE, District Judge. The facts developed in this proceeding show that this photoplay, "The Spirit of '76," attempts to portray some of the more important phases of the American War for Independence, and special scenes, like Paul Revere's Ride, the signing of the Declaration of Independence, and the like, are given particular mention and prominence. In addition—and these are the parts of the film inveighed against—scenes purporting to illustrate the Wyoming Valley Massacre are shown. A British soldier is pictured impaling on a bayonet a baby

lying in its cradle and then whirling it around his head so impaled. Other unspeakable atrocities committed by British soldiers, including the shooting of harmless women, the dragging off, sometimes by the hair of the head, of young American girls, etc., are exhibited.

Because of adverse criticism and objection, before the scheduled initial performance a private exhibition of the picture was had, attended by divers local and governmental representatives. At this performance none of the objectionable features above mentioned were shown, and in consequence no open objection to the proposed run of the play was voiced. Immediately following this preliminary presentation, though, the director, Goldstein, inserted into the film in appropriate places the scenes of the Wyoming Massacre just referred to, and proceeded to show them at the ensuing evening performance. This he did, he says, "to excite the audience" and attract greater attention to his production.

The film is owned by a corporation, but seems to be and to have been managed by Goldstein, the man who wrote the scenario and who has "produced" the picture. As is usual in such cases, a good many thousands of dollars, probably in excess of $100,000, have been expended in the work of such production.

I have listened very carefully to the statement of Mr. Scott, counsel for the stockholders in the film company, and I sympathize with them for having made an investment in this film with no knowledge of its true character. The various stockholders, of course, I do not know, and, in consequence, cannot know their attitude toward the presentation of this film. I have given careful consideration to the suggestion made by counsel with respect to the possibility, and even probability, of financial losses inuring to the stockholders—perhaps of some considerable consequence. Bearing all this in mind, however, and assuming that they and their associates are going to suffer some considerable loss, this court at this time is in no mood to weigh the financial losses of a few individuals as against possible detriment to the United States of America. If it be that some will have to suffer loss, yet it is only a financial loss, and, at worst, will be only a fractional part of the loss that others are going to have to suffer—some even of their lives—because of the war in which we are now engaged.

History is history, and fact is fact. There is no doubt about that. At the present time, however, the United States is confronted with what I conceive to be the greatest emergency we have ever been confronted with at any time in our history. There is now required of us the greatest amount of devotion to a common cause, the greatest amount of co-operation, the greatest amount of efficiency, and the greatest amount of disposition to further the ultimate success of American arms that can be conceived, and as a necessary consequence no man should be permitted, by deliberate act, or even unthinkingly, to do that which will in any way detract from the efforts which the United States is putting forth or serve to postpone for a single moment the early coming of the day when the success of our arms shall be a fact and the righteousness of our cause shall have been demonstrated.

We are engaged in a war in which Great Britain is an ally of the

United States. It is a fact that we were at war with Great Britain during the Revolutionary times, and whatever occurred there is written upon the page of history and will have to stand, whomsoever may be injured or hurt by the recital or recollection of it. But this is no time, in my judgment (this is the thought that controls me in this matter), whatever may be the excuse, whether it be a financial return or otherwise, for the exploitation of those things that may have the tendency or effect of sowing dissension among our people, and of creating animosity or want of confidence between us and our allies, because so to do weakens our efforts, weakens the chance of our success, impairs our solidarity, and renders less useful the lives we are giving, to the end that this war may soon be over and peace may soon become a thing substantial and permanent with us. I am in no mood, either, particularly after having listened to the testimony of this man Goldstein, to consider the suggestion that the film be returned, and so much of it be permitted to be exhibited as has not met with special objection.

It is a fair inference from the circumstances, considering the hearing had in Chicago, the objections then made, the language used in characterizing its scenes of atrocity as being "reprehensible" and as evidencing "malice," that the disposition and purpose of the whole play in its deeper significance is to incite hatred of England and England's soldiers. And it is not at all necessary that it should be shown to have such effect; it is enough if it is calculated reasonably so to excite or inflame the passions of our people, or some of them, as that they will be deterred from giving that full measure of co-operation, sympathy, assistance, and sacrifice which is due to Great Britain, simply because of the fact that Great Britain, as an ally of ours, is working with us to fight the battle which we think strikes at our very existence as a nation.

Ordinarily the exploitation of such harmless, in one sense, highly inspiring, in another sense, scenes as Paul Revere's Ride, which is one of the most beautiful things in history, could not be detrimental or distasteful to anybody. Ordinarily it could be put on in such a way as to be a source of unending delight and gratification to any man, be he American or be he English; but that is not the point. There are interspersed in this play those things which tend to appeal to the passions of our nature, which tend to arouse our revenge and to question the good faith of our ally, Great Britain, and to make us a little bit slack in our loyalty to Great Britain in this great catastrophe or emergency. Therefore, as I say, this is no time or place for the exploitation of that which, at another time or place, or under different circumstances, might be harmless and innocuous in its every aspect. It is like the "right of free speech," upon which such great stress is now being laid. That which in ordinary times might be clearly permissible, or even commendable, in this hour of national emergency, effort, and peril, may be as clearly treasonable, and therefore properly subject to review and repression. The constitutional guaranty of "free speech" carries with it no right to subvert the purposes and destiny of the nation.

In addition, this man, by his own admission, knew that these things— the bayoneting of the babe and the like—had been severely criticized

and were inhibited.    He knew that objection had been made to them. He knew, just as well as he knows we are sitting here now, that the private presentation of this film on last Tuesday morning was for the purpose of seeing if there was anything objectionable in it.    To fit it for such private presentation it was gone over by him with a fine tooth comb, no doubt; but immediately thereafter a sedulous effort was indulged in by him to insert those things which would tend to "excite" and to create a prejudice against Great Britain.    This demands an inquiry into the ultimate motives and purposes of this man, and no doubt justifies other and different action against him.    But in any event, referring to the special problem now before us, and considering only the harm not to come to us, I feel that I can do no less than to say that, so far as it is within the power of this court, this thing has got to stop.

I have no disposition, of course, to confiscate any one's property. There may come a time and place where this play, devoid of some of its horror, which never ought to be in it at any time, and devoid of its immorality, which is and ought to be shocking to any man who possesses a respectable quantum of decency in his makeup, devoid of those things, the time may come when it could be put on, and put on entertainingly and refreshingly before an audience of American people.    The fact is, however, that the film is of such a character that it can be used to our national disadvantage in time of national emergency, and this cannot be allowed.    If the result be to bring a loss upon those who are financially interested, so be it.    It is merely a loss they must sustain because of the unwisdom they have demonstrated in trusting their financial affairs to one who possesses such a slight modicum of appreciation of the eternal fitness of things as does this man who is presenting and claiming the right to present this picture at this time.

The motion for the return of the film will be denied without prejudice.    It will be held in the possession of the marshal until such time as, under changed conditions, it may properly be presented, and the district attorney is directed to prepare for the court a warrant for the seizure of the original, which is within the jurisdiction of this court, as shown by the testimony given here, and that will be put in the same place and kept under the same surveillance.